UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-cv-23604-WILLIAMS/MCALILEY

VICTOR ARIZA,

      Plaintiff,

v.

SOUTH MOON SALES, INC., a
foreign for-profit corporation,

      Defendant.

_____/

**AMENDED REPORT AND RECOMMENDATION ON
AMENDED MOTION FOR DEFAULT FINAL JUDGMENT**[1]

     Plaintiff, Victor Ariza, filed an Amended Motion for Default Final Judgment (the

"Amended Motion"), (ECF No. 13), against Defendant, South Moon Sales, Inc., which the

Honorable Kathleen M. Williams referred to me for a report and recommendation. (ECF

No. 15). Defendant has not filed a response and the time to do so has passed.

**I.    Background**

     Plaintiff is visually impaired, and he relies on screen reader software to use his

computer. Defendant is a corporation that owns and operates a retail apparel and accessory

store located at 714 E. Las Olas Boulevard, Fort Lauderdale, Florida, along with an adjunct

---

[1] This Amended Report and Recommendation supersedes the Report and Recommendation the
Court issued on August 11, 2022. (ECF No. 16). The substantive difference between the two is the
analysis in Section II(b) regarding the second and third elements of Plaintiff's ADA claim. The
recommendation that the Court enter a final default judgment for Plaintiff on Count I, but not on
Count II, remains the same.

website for that business, https://southmoonunder.com (the "Website"). *See generally*
(ECF No. 1).

Plaintiff filed his two-count Complaint in October 2021. (*Id.*). It alleges that
Defendant violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§§ 12181-12189 (Count I), and the Rehabilitation Act of 1973 (the "Rehab Act"), 29
U.S.C. § 794 (Count II). At its essence, the Complaint alleges that Defendant did so by
denying him full access to the Website because Defendant has not designed the Website to
interface with widely and readily available screen reader software. *See* (*id.* at 7 ¶ 21, 15
¶ 65).

On October 15, 2021, Plaintiff served Defendant with the Complaint and summons.
(ECF No. 6). Defendant has not filed a response to it, and no attorney has entered an
appearance on its behalf.[2]

On November 15, 2021, the Clerk entered default against Defendant for failure to
plead or otherwise defend, pursuant to Rule 55(e) of the Federal Rules of Civil Procedure.
(ECF No. 10).

Plaintiff thereafter filed the Amended Motion for Default Final Judgment. (ECF
No. 13).[3] It asks the Court for injunctive and declaratory relief, and an award of attorneys'

---

[2] Defendant may only litigate through an attorney. *See Potter v. Altman*, 647 F. App'x 974, 976
(11th Cir. 2016) ("It is well-settled that a corporate entity must appear and litigate through counsel,
and cannot proceed *pro se*.") (citation omitted).

[3] Plaintiff filed the Amended Motion one day after he filed the initial Motion for Default Final
Judgment. (ECF Nos. 12, 13). As such, the Court denied the initial Motion as moot. (ECF No. 14).

fees, costs and litigation expenses. (*Id.*).[4] For the reasons that follow, I recommend that the Court grant the Amended Motion in part; specifically, that it enter a default judgment against Defendant on the ADA claim (Count I), but not the Rehab Act claim (Count II), and that it award Plaintiff most of the attorneys' fees, costs and litigation expenses that his attorneys request.

## II.   Liability

### a.   Standard

A court may enter a default judgment against a defendant who has failed to plead or otherwise defend against the lawsuit. *See* Fed. R. Civ. P. 55(b)(2). Before it may do so, the Court must determine that there is "a sufficient basis in the pleadings for the judgment entered," which finding is "akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quotation marks and citation omitted). When a defendant defaults, it admits as true all well-pleaded factual allegations in the complaint. *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007).

### b.   The ADA claim (Count I)

Title III of the ADA provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who

---

[4] In his Complaint, Plaintiff also seeks damages for intentional discrimination under the Rehab Act. In his Amended Motion, Plaintiff is clear that he does not ask the Court to award money damages via a default judgment. (ECF No. 13 at 1 n.1).

owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). To state a claim under Title III, Plaintiff must therefore allege that (1) he is a disabled individual; (2) Defendant owns, leases, or operates a place of public accommodation; and (3) Defendant discriminated against Plaintiff within the meaning of the ADA. *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).

The Complaint alleges the first element of his ADA claim, as it states that Plaintiff is legally blind and, thus, is a disabled person. (ECF No. 1 at 2 ¶¶ 5-6; 3 ¶¶ 8-9); 42 U.S.C. §12102(1)(A), (2)(A) (defining the term "disability" as a physical or mental impairment that substantially limits at least one or more major life activities, and lists "seeing" as a major life activity).

As for the second element, Plaintiff alleges that Defendant is a place of public accommodation because it owns and/or operates a retail apparel and accessory store under the brand name "South Moon Under". (ECF No. 1 at 3-4 ¶¶ 10-11). Plaintiff, though, does not allege that Defendant's physical store violates the ADA. Instead, Plaintiff alleges that Defendant's website does. (*Id*. at 14-15 ¶¶ 60-65). The ADA provides an extensive list of public accommodations, including "clothing store[s]". 42 U.S.C. § 12181(7)(B). However, this list includes only establishments with a physical location; websites are not included. 42 U.S.C. § 12181(7).

The Eleventh Circuit has not decided whether a website is a place of public accommodation within the meaning of the ADA. It did address the issue in a now vacated

opinion,[5] *Gil v. Winn-Dixie Stores, Inc.*, where the majority held that "websites are not a place of public accommodation under Title III of the ADA." 993 F.3d 1266, 1277 (11th Cir. 2021). The *Gil* Court reasoned as follows:

> The statutory language in Title III of the ADA defining "public accommodation" is unambiguous and clear. It describes twelve types of locations that are public accommodations. All of these listed types of locations are tangible, physical places. No intangible places or spaces, such as websites, are listed. Thus, we conclude that, pursuant to the plain language of Title III of the ADA, public accommodations are limited to actual, physical places.

*Id.* at 1276-77. Although *Gil* is no longer law, I find this reasoning persuasive and adopt it here.[6]

Although I conclude that Defendant's website is not a place of public accommodation, this does not mean that a website cannot be the subject of an ADA claim. This is because "the definition of discrimination provided in Title III [of the ADA] covers both tangible barriers, that is, physical and architectural barriers ... and *intangible barriers*, such as ... discriminatory policies and procedures that restrict a disabled person's ability to enjoy the ... goods, services and privileges" of a physical place of public accommodation.

---

[5] On December 28, 2021, the Eleventh Circuit granted a Petition for Panel Rehearing and vacated its decision in *Gil* because "[d]ue to the expiration of the injunction while the appeal was pending and the absence of any formal award of declaratory relief, the appeal was rendered moot." *Gil v. Winn-Dixie Stores, Inc.*, 21 F.4th 775, 776 (11th Cir. 2021).

[6] Notably, the dissent in *Gil* agreed with the majority that websites themselves are not places of public accommodation under Title III of the ADA. *Gil*, 993 F.3d at 1285 n.1 (Jill Pryor, J., dissenting) ("I am not arguing that the website in and of itself was a place of public accommodation under the ADA, but I disagree with the majority opinion's decision to fashion new circuit law on that issue, an issue on which the circuits are split.").

*Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1283 (11th Cir. 2002) (emphasis added). In other words, as long as a website operates as an intangible barrier to a physical establishment, and that physical establishment qualifies as a place of public accommodation, a plaintiff can state a claim for violation of the ADA.[7]

In an unpublished decision, *Haynes v. Dunkin' Donuts LLC*, the Eleventh Circuit considered whether the plaintiff stated a claim that Dunkin' Donuts' website, which was not compatible with screen reader software, violated the ADA. 741 F. App'x 752 (11th Cir. 2018). Dunkin' Donuts acknowledged that its stores are places of public accommodation but argued that the plaintiff could not state a claim for relief because "its website is neither a place of public accommodation nor a good, service, facility, privilege, or advantage of its shops ...." *Id.* at 753. The *Haynes* Court concluded that the plaintiff stated a plausible claim for relief under the ADA, but not because the website was a place of public accommodation. Rather, relying upon *Rendon*, the Court reasoned that:

> It appears that the website is a service that facilitates the use of Dunkin' Donuts' shops, which are places of public accommodation. And the ADA is clear that whatever goods and services Dunkin' Donuts offers as part of its place of public accommodation, it cannot discriminate against people on the basis of a disability, even if those goods and services are intangible.

---

[7] I recognize that at times other divisions of this Court examined the relationship between a defendant's website and its physical establishment and found that the website was a place of public accommodation. *See, e.g.*, *Fuller v. Mazal Grp. LLC*, No. 18-cv-60456, 2018 WL 3584700, at *3 (S.D. Fla. July 25, 2018) (collecting cases). Given the statutory language of the ADA, and the reasons explained *infra*, I find that the Website is an intangible barrier that operates as a form of discrimination, rather than constitutes a place of public accommodation in and of itself.

*Id*. at 754 (citing 42 U.S.C. § 12182(a); *Rendon*, 294 F.3d at 1283)). The Court found that "the alleged inaccessibility of Dunkin' Donuts' website denies [plaintiff] access to the services of the shops that are available on Dunkin' Donuts' website, which includes the information about store locations and the ability to buy gift cards online." *Id*. In other words, the plaintiff stated a claim for violation of the ADA because Dunkin' Donuts' stores are places of public accommodation, thereby satisfying the second element of an ADA claim, and its website amounted to an intangible barrier, which satisfied the third element.

Applying the foregoing authority to the Complaint, the relevant issue is not whether the Website is a place of public accommodation, but whether the Website creates an intangible barrier that excludes Plaintiff from accessing the goods, services, and privileges of Defendant's physical store, which *is* a place of public accommodation. Similar to *Haynes*, Plaintiff alleges that the Website allows users to, among other things, "secure information about the locations of Defendant's physical stores through its 'store locator' feature, purchase merchandise also available for purchase in the physical stores, purchase gift cards for use online and in the physical stores, and sign up for an electronic emailer to receive exclusive online offers, benefits, invitations, and discounts for use online and in the physical stores". (ECF No. 1 at 4 ¶ 14). Plaintiff further alleges that "Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software", and provides a list of what those intangible barriers are.[8] (*Id.* at 7 ¶ 21). Plaintiff also alleges that the

---

[8] Some examples include: "Submenu is inaccessible when navigating with a keyboard;" "Hidden links throughout the website are mislabeled as 'link' with no other description;" "Product prices,

Website "lacks prompting information and accommodations necessary to ... locate and accurately fill out online forms to purchase Defendant's merchandise." (*Id.* at 7 ¶ 22). These factual allegations are deemed admitted by virtue of Defendant's default. *See Tyco Fire & Sec., LLC*, 218 F. App'x at 863.

The ADA provides that discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services ...." 42 U.S.C. § 12182(b)(2)(A)(iii). Title 28 C.F.R. § 36.303(b)(2) lists "screen reader software" as an example of an auxiliary aid or service for "individuals who are blind or have low vision." As noted, Plaintiff alleges that Defendant fails to make the Website accessible to visually disabled people who must use screen reader software. (ECF No. 1 at 14 ¶ 60). The Complaint thus properly pleads the final element, that Defendant discriminated against him, within the meaning of the ADA. *See, e.g.*, *Haynes*, 741 F. App'x at 754 (holding that "failure to make [services of Dunkin' Donuts' shops that are available on Dunkin' Donuts' website] accessible to the blind can be said to exclude, deny, or otherwise treat blind people differently than other individuals because of the absence of auxiliary aids and services.") (quotation marks and citation omitted).

---

color options, and descriptions are all inaccessible;" and "the add to bag button is not accessible". (ECF No. 1 at 7 ¶ 21).

In sum, for the reasons explained above, I conclude that Defendant's website is not a place of public accommodation. Defendant nevertheless violated Title III of the ADA because the Website restricts Plaintiff's ability to access the goods, services, and privileges of Defendant's physical store, which is a place of public accommodation, and thus the Website operates as an intangible barrier to a public accommodation. *Rendon*, 294 F.3d at 1283; *Haynes*, 741 F. App'x at 754. Therefore, there is a sufficient basis in the pleading for the Court to enter a final judgment against Defendant.

### c.  The Rehab Act claim (Count II)

As noted, in Count II Plaintiff alleges that Defendant's failure to equip the Website with screen reader software also amounts to unlawful discrimination under the Rehab Act. For the reasons that follow, I conclude that Count II does not properly allege a claim that Defendant violated the Rehab Act.

### 1.  The Rehab Act

Section 504 of the Rehab Act provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance* …." 29 U.S.C. § 794(a) (emphasis added). The statute defines "program or activity" to include "an entire corporation, partnership, or other private organization, or an entire sole proprietorship if assistance is extended to such corporation, partnership, private organization, or sole proprietorship *as a whole* …." *Id.* at § 794(b)(3)(A)(i) (emphasis added).

While Section 504 does not define the term "Federal financial assistance," the legislative history provides guidance. The Senate Report gives this explanation of "federal financial assistance" within the meaning of Section 504:

> Federal financial assistance extended to a corporation or other entity "as a whole" refers to situations where the corporation *receives general assistance that is not designated for a particular purpose*. Federal financial assistance to the Chrysler Company for the purpose of preventing the company from going bankrupt would be an example of assistance to a corporation "as a whole." Federal aid which is limited in purpose, e.g., Job Training Partnership Act (JPTA) [*sic*] funds, is not considered aid to the corporation as a whole, even if it is used at several facilities and the corporation has discretion to determine which of its facilities participates in the program. A grant to a religious organization to enable it to extend assistance to refugees would not be assistance to the religious organization as a whole if that is only one among a number of activities of the organization.

S. REP. 100-64 at *17 (1987) (emphasis added).

Plaintiff alleges that Defendant received federal financial assistance "as a whole" when it received funds, during the COVID-19 pandemic, under the government's Paycheck Protection Program. (ECF No. 1 at 3 ¶ 7); (ECF No. 1-2). The following review of the statutory language of the CARES Act, and the corresponding regulatory framework, does not support this allegation.

### 2.    The Paycheck Protection Program

The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") created the Paycheck Protection Program ("PPP"), which authorizes the Small Business Administration ("SBA") to guarantee loans to small businesses affected by the COVID-19 pandemic. 15 U.S.C. §636(a)(36)(B), (F). "The [CARES] Act is in large part aimed at

10

helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020). The PPP is one of the programs "designed to accomplish that goal." *Id.* at 1247.

The SBA administers PPP loans under section 7(a) of the Small Business Act, which is the SBA's primary program for providing financial assistance to small businesses.[9] 15 U.S.C. §636(a)(36)(B). The PPP allows eligible small businesses to obtain guaranteed loans to cover certain expenses, and those loans may be forgiven if the recipient uses the proceeds in a specified manner.[10] Subparagraph 36(F) sets forth the following "allowable uses of covered loans":

> During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for –
>
> (I)     payroll costs;
>
> (II)    costs related to the continuation of group health care benefits during periods of paid sick, medical or family leave, and insurance premiums;
>
> (III)   employee salaries, commissions, or similar compensations;
>
> (IV)   payments of interest on any mortgage obligation …;
>
> (V)    rent (including rent under a lease agreement);

---

[9] Congress created the PPP by adding subparagraph (36) to the SBA's existing Section 7(a) loan program, which is codified in 15 U.S.C. § 636(a). *See* 15 U.S.C. § 636(a)(36).

[10] To be clear, as summarized below, the statute and regulations establish criteria for receipt of a PPP loan and criteria for forgiveness of that loan.

(VI)    utilities;

(VII)   interest on any other debt obligations that were incurred before the covered period;

(VIII)  covered operations expenditures, as defined in section 636m(a) of this title;

(IX)    covered supplier costs, as defined in section 636(m)(a) of this title; and

(X)     covered worker protection expenditures, as defined in section 636m(a) of this title.

*Id.* at § 636(a)(36)(F)(i).

Additionally, 15 U.S.C. § 636m(b) limits the allowable uses for loan proceeds which are eligible for loan forgiveness. An eligible borrower may receive loan forgiveness equal to the amount of PPP loan proceeds used for (i) payroll costs, (ii) mortgage interest, (iii) rent, (iv) utilities, (v) covered operations expenditures, (vi) covered property damage costs, (vii) covered supplier costs, and (viii) covered worker protection costs. *See* 15 U.S.C. § 636m(b). The statute further limits eligibility for loan forgiveness to eligible recipients who use "at least 60 percent of the covered loan amount for payroll costs" noting that they may use up to 40 percent of the covered loan amount for the remaining uses specified in section 636m(b). *Id.* at 636m(d)(8).

The CARES Act delegates authority to the SBA Administrator "to issue regulations to carry out" the PPP. *See* 15 U.S.C. § 9012. Pursuant to this authority, the SBA issued an interim final rule on April 15, 2020 (the "Interim Final Rule"), which further narrows the permissible uses of a PPP loan. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811 (Apr. 15, 2020).

Specifically, the Interim Final Rule instructs that proceeds of a PPP loan "are to be used for" (i) payroll costs, (ii) costs of group health insurance benefits, (iii) mortgage interest payments, (iv) rent, (v) utilities, (vi) interest payments on debt obligations incurred before February 15, 2021, and/or (vii) refinancing an SBA EIDL loan made between January 21, 2020, and April 3, 2020. *Id.* at 20,814. It also requires that "at least 75 percent of the PPP loans proceeds shall be used for payroll costs."[11] *Id.* (emphasis added). The SBA justified these more stringent limitations on a borrower's ability to use PPP loan proceeds this way:

> While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a *requirement that borrowers use a substantial portion of the loan proceeds for payroll costs*, consistent with Congress' overarching goal of keeping workers paid and employed.
>
> *****
>
> This *limitation on the use of the loan funds* will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

*Id.* (emphasis added).

The Interim Final Rule thus makes clear that the restrictions contained therein are not confined to only those borrowers who seek loan forgiveness but, rather, apply to all

---

[11] Congress, in the Paycheck Protection Flexibility Act of 2020, later lowered the 75% threshold that the SBA had set by mandating that at least 60% of PPP loan proceeds be used for payroll costs. Pub. L. No. 116-142 (June 5, 2020).

borrowers that receive PPP loans. The Interim Final Rule also makes clear that noncompliance will result in serious consequences. A borrower who uses PPP funds for "unauthorized purposes" will be "direct[ed] to repay those amounts" and a borrower who "knowingly use[s] the funds for unauthorized purposes … will be subject to additional liability such as charges for fraud." *Id.*

Finally, subparagraph 36(G) requires that PPP loan applicants submit a good faith certification with their application. 15 U.S.C. § 636(a)(36)(G)(i). The statute provides that an "eligible recipient" applying for a PPP loan "shall make a good faith certification" that, among other things, "the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient" and "the funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments …." *Id.* at § 636(a)(36)(G)(i)(I)-(II). The Interim Final Rule also requires the applicant to certify that "I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud." 85 Fed. Reg. at 20,814.

### 3.    Section 504 is Inapplicable

Plaintiff argues that Defendant is subject to Section 504 of the Rehab Act because the company "as a whole" received federal funds in the form of PPP loans. (ECF No. 13 at 11).

As mentioned, Section 504 is applicable to private entities that receive federal financial assistance "as a whole"; however, the legislative history of the Rehab Act clarifies that federal financial assistance is extended to a private entity "as a whole" when the entity

"receives general assistance that is not designated for a particular purpose." 29 U.S.C. § 794(b)(3)(A)(i); S. REP. 100-64 at *17. The Court concludes that the plain language of Title 15 U.S.C. § 636(a)(36) and the SBA's Interim Final Rule demonstrate that a PPP loan is not general assistance but, rather, is designated for a particular purpose.

A PPP loan recipient's use of PPP funds, regardless of whether loan forgiveness is sought or received, is constrained by the statute and regulation. Recipients are not free to use PPP loan proceeds as they see fit to maintain their operations. Rather, the statute sets out a list of "allowable uses," and the PPP loan applicant must certify that the funds will be used for specified purposes, namely "to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments." 15 U.S.C. § 636(a)(36)(G). The Interim Final Rule reduces the list of allowable uses even further and mandates that PPP loan proceeds be used to pay particular costs. 85 Fed. Reg. at 20,814.

Significantly, the statute and regulation mandate that recipients use a specified percentage of PPP loan proceeds for payroll costs.[12] *Id.*; 15 U.S.C. § 636(m)(b). Moreover, PPP loan recipients are subject to harsh consequences for misuse of PPP funds, including repayment of the loan and, for knowingly misusing the funds, federal fraud charges. 85 Fed. Reg. at 20,814.

Plaintiff cites two cases in its Motion as support for his Rehab Act claim: (1) *Fernandez v. Bruno Northfleet*, 568 F. Supp. 3d 1294, 1300 (S.D. Fla. 2021), where a division of this Court found that a similar allegation was sufficient to overcome a motion

---

[12] This priority is reflected in the title of the aid program, the *Paycheck* Protection Program.

to dismiss, which in turn cited (2) *Husbands v. Fin. Mgmt. Sols., LLC*, No. GJH-20-3618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021), where a Maryland district court drew a similar conclusion. (ECF No. 13 at 11). Before I turn to those decisions, I address *Moore v. Sun Bank of N. Fla., N.A.*, 923 F.2d 1423 (11th Cir. 1991).

In that case, the Eleventh Circuit Court of Appeals, in a split decision, concluded that a national bank's participation in the SBA's guaranteed loan program constituted receipt of federal financial assistance pursuant to Section 504. The *Moore* decision is distinguishable from the case before this Court, in several important ways. First, *Moore* preceded the creation of the PPP by many years, and it considered the SBA's guaranteed loan program more broadly. This is significant because, unlike traditional SBA loans which can be used for a variety of general business purposes, the PPP and implementing regulations significantly limit how the borrower can utilize PPP loan proceeds; they also dictate how the borrower must apportion loan proceeds among the allowable uses. *See* 15 U.S.C. § 636(a)(36)(F), (G); 85 Fed. Reg. at 20,814; 15 U.S.C. § 636(m)(b).

Second, the *Moore* Court did not address the legislative history discussed above, nor did it examine whether the assistance was provided to the entity "as a whole." Instead, the Court examined whether contracts of insurance or guaranty are excluded from the definition of federal financial assistance (they are not), and whether the bank was a "mere beneficiary of federal funds" or a "recipient" (it was a recipient). *Id.* at 1425-32. Neither of those issues are relevant here. For these reasons, *Moore* does not cause this Court to conclude that Defendant's PPP loans bring it within the scope of the Rehab Act.

16

In *Bruno Northfleet*, another division of this Court denied a motion to dismiss a Section 504 claim where the plaintiff, as here, alleged that the defendant's receipt of PPP loans subjected it to the Rehab Act. *Fernandez v. Bruno Northfleet*, 568 F. Supp. 3d at 1300. There, the Court found that allegations that the defendant "owns or operates a business that is the recipient of federal financial assistance" and "as a recipient of financial assistance, Defendant has subjected itself and all of its operations … including its website, to the provisions of the Rehab Act" were "sufficient at the pleading stage" to allege a claim under the Rehab Act. *Id.* The *Bruno Northfleet* Court relied upon the *Moore* decision as support for its conclusion, although with no analysis of that decision.

As for the *Husbands* decision, the defendant there raised a different argument: that the Rehab Act was inapplicable because the defendant received its PPP loans after the acts alleged in the amended complaint. *Husbands*, 2021 WL 4339436, at *8. Without further analysis, that Court concluded that the allegations were sufficient to state a claim. *Id.* In my view, neither *Bruno Northfleet* nor *Husbands* justify the conclusion that a PPP loan is federal financial assistance within the meaning of the Rehab Act.

In sum, the Court concludes that Plaintiff has failed to plead that Defendant received federal financial assistance within the meaning of the Rehab Act, which is an essential element of Count II. For that reason, I recommend that the Court not enter default judgment against Defendant on Count II.

### III.   Attorneys' fees, costs and litigation expenses

Plaintiff seeks an award of attorneys' fees, costs and litigation expenses that total $11,005.00. (ECF No. 13 at 20). This number represents $6,205.00 in attorneys' fees, $525.00 in costs and $4,275.00 in litigation expenses. (*Id.*).

The ADA authorizes the Court to award the prevailing party "a reasonable attorney's fee, including litigation expenses, and costs". 42 U.S.C. § 12205.[13] Given Defendant's default, there is no dispute that Plaintiff is the prevailing party.

### a.   Attorneys' fees

"A party seeking to recover attorneys' fees bears the burden of providing specific and detailed evidence so that a determination can be made of the necessity of the action and the reasonableness of the time claimed for the action." *Hermosilla v. Coca-Cola Co.*, No. 10-21418-CIV, 2011 WL 9364952, at *14 (S.D. Fla. July 15, 2011) (citing *ACLU of Ga. v. Barnes*, 168 F.3d 427, 432-33 (11th Cir. 1999)). "The first step in computing a reasonable fee is to determine the lodestar, which is the product of the number of hours reasonably worked by a lawyer and a reasonable hourly rate." *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354 (11th Cir. 2000) (citation omitted).

The reasonable hourly rate is determined by "[t]he prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1387, 1389

---

[13] In light of my recommendation regarding Plaintiff's Rehab Act claim, I do not address Plaintiff's entitlement to attorneys' fees under that Act.

(11th Cir. 1997) (citation omitted). The relevant market is where the case is filed. *ACLU*, 168 F.3d at 427 (citation omitted).

Plaintiff requests an hourly rate of $425.00 for each of his attorneys, Roderick Hannah, Esq. and Pelayo Duran, Esq. (ECF No. 13 at 18). Mr. Hannah has over 37 years' experience and Mr. Duran has over 23 years' experience, and both focus on ADA discrimination cases. (*Id.* at 15). Based upon the record and the Court's own knowledge and experience, I recommend that the Court accept their hourly rate of $425.00, which is consistent with the hourly rate awarded for similar work in this district. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) (citations omitted) (the Court may use its own knowledge and experience in determining the reasonableness of attorneys' fees); *Ariza v. Untuckit, LLC*, No. 19-cv-24291, 2020 WL 408241, at *2 (S.D. Fla. Jan. 24, 2020); (finding that Messrs. Hannah's and Duran's hourly rate of $425.00 in a similar ADA case is reasonable); *Fuller v. Things Remembered, Inc.*, No. 19-62034-CIV, 2020 WL 1316509, at *2 (S.D. Fla. Feb. 11, 2020) (same), *report and recommendation adopted*, 2020 WL 1316508 (S.D. Fla. Mar. 19, 2020).

With respect to the number of hours reasonably expended, Plaintiff's attorneys' billing records reflect that they devoted 14.6 hours to this litigation. (ECF Nos. 13-3, 13-4). I have carefully reviewed those documents and find that those hours were reasonably expended. *Id*. Accordingly, I recommend that the Court award attorneys' fees totaling **$6,205.00**.[14]

---

[14] 14.6 hours x $425.00 = $6,205.00.

**b. Costs**

Plaintiff seeks $525.00 in costs, comprised of $402.00 in filing fees, $75.00 for service of process and $48.00 for printing. (ECF No. 13 at 19-20).

Title 28 U.S.C. § 1920 sets forth what may be taxed as costs. The $402.00 filing fee that Plaintiff paid to the clerk is taxable under § 1920 and Plaintiff is entitled to recover it. 28. U.S.C. § 1920(1); *Ramos v. Arba Constr.*, No. 20-25192-CIV, 2021 WL 4482659, at *3 (S.D. Fla. Aug. 25, 2021) (citation omitted), *report and recommendation adopted*, 2021 WL 4480169 (S.D. Fla. Sept. 30, 2021). Likewise, costs of photocopies are taxable and Plaintiff is entitled to recover the $48.00 he expended for printing. 28. U.S.C. § 1920(4); *Fuller*, 2020 WL 1316509, at *1.

Costs for service of process are also included under § 1920. Private process servers' fees, however, may not exceed the cost of having the U.S. Marshal's service effectuate service. *James v. Wash Depot Holdings, Inc.*, 242 F.R.D. 645, 649 (S.D. Fla. 2007) (citing *EEOC v. W&O, Inc.*, 213 F.3d 600, 623-24 (11th Cir. 2000)). At the time service of process occurred, the U.S. Marshals charged $65.00 per hour for each item served. Plaintiff provides no explanation why the Court should award costs for service above that amount. I therefore recommend that the Court should reduce the costs awarded for service of process to $65.00. *See Lezer Corp. v. Noble Partners, LLC*, No. 20-23235-Civ, 2021 WL 883492, at *3 (S.D. Fla. Feb. 19, 2021) (collecting cases), *report and recommendation adopted*, 2021 WL 880280, at *1 (S.D. Fla. Mar. 9, 2021).

In sum, I recommend that the Court award Plaintiff a total of **$515.00** in costs.

### c. Litigation expenses

Plaintiff seeks $4,275.00 in litigation expenses for the services of an expert witness, Robert D. Moody. (ECF No. 13 at 20). Mr. Moody was retained to analyze Defendant's Website to determine its compliance with the ADA. Plaintiff attached his declaration to the Complaint and his curriculum vitae and an invoice for his services to the Amended Motion. (ECF Nos. 1-3; 13-6). Plaintiff requests an hourly rate of $450.00 for Mr. Moody's services. (ECF No. 13 at 20). Other divisions of this Court have found that hourly rate for similar work in ADA cases to be reasonable. *See Ariza*, 2020 WL 408241, at *3; *Fuller*, 2020 WL 1316509, at *2-3. I have reviewed Mr. Moody's qualifications and experience, and I recommend that the Court accept this hourly rate.

The invoice Plaintiff attached to the Amended Motion shows that Mr. Moody performed 9.5 hours of work towards this case. I have reviewed the descriptions of the tasks he performed, and I find that they were reasonably expended. I therefore recommend that the Court award litigation expenses in the total amount of **$4,275.00**.

## IV.   Conclusion

Therefore, I **RESPECTFULLY RECOMMEND** that the Court:

1. Grant Plaintiff's Amended Motion for Default Final Judgment (ECF No. 13) in part;

2. Enter default final judgment in favor of Plaintiff Victor Ariza and against Defendant South Moon Sales, Inc. on Count I of the Complaint only;

3. Declare and find that Defendant's Website, https://southmoonunder.com, which acts as a point of sale for Defendant's merchandise that is also sold in and from

Defendant's physical stores, contains access barriers and is not fully and equally accessible to blind and visually disabled users such as Plaintiff, in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189.

4. Order that Defendant shall not, no later than six (6) months from the date the Final Judgment is entered, deny any visually impaired individuals, including Plaintiff, the opportunity to access, participate in, and benefit from the goods, services, facilities, privileges, advantages, programs, activities, and accommodations provided through its Website, https://southmoonunder.com. The Website must be accessible by visually impaired individuals who use computers, laptops, tablets, and smart phones.

5. Order that Defendant shall not, no later than six (6) months from the date the Final Judgment is entered, provide visually impaired individuals, including Plaintiff, an unequal opportunity to access, participate in, and benefit from the goods, services, facilities, privileges, advantages, programs, activities, and accommodations provided through its Website, https://southmoonunder.com. The Website must be accessible by visually impaired individuals who use computers, laptops, tablets, and smart phones.

6. Order that if Plaintiff believes the injunction has been violated, he shall give written notice (including reasonable particulars) to Defendant of such violation. Defendant shall have thirty (30) calendar days from receipt of the written notice to investigate and correct any alleged violations. If Defendant fails to correct the violations, Plaintiff may then seek relief from the Court;

7.  Award Plaintiff reasonable attorney's fees in the amount of **$6,205.00**, costs in the amount of **$515.00** and litigation expenses in the amount of **$4,275.00**, for a total amount of **$10,995**.[15]

## V.    Objections

**No later than nine (9) days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Kathleen M. Williams, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016).[16]

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida this 7th day of September 2022.

CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE

---

[15] Plaintiff asks the Court to order Defendant to make the Website compliant with the Web Content Accessibility Guidelines ("WCAG") 2.0, Level AA criteria. *See* (ECF No. 13-2). In his Amended Motion, Plaintiff provides no legal authority that the ADA requires adherence to this standard. In fact, as another Court has noted, "WCAG does not create actionable standards to determine if a website complies [with] the ADA." *Bryan v. Florencia Park LLC*, No. 19-cv-1197, 2019 WL 4394002, at *4 (M.D. Fla. Sept. 13, 2019). I therefore recommend that the Court deny that request. *See, e.g.*, *Gomez v. J. Lindeberg USA, LLC*, No. 16-22966-CIV, 2016 WL 9244732, at *2 (S.D. Fla. Oct. 18, 2016).

[16] The Court shortens the objection period as it recognizes that no objections were filed within fourteen days after the Court entered the initial Report and Recommendation (ECF No. 16).

cc:    Honorable Kathleen M. Williams
       Counsel of record

       South Moon Sales, Inc.
       115 North Calhoun Street
       Suite 4
       Tallahassee, FL 32301